Marion Myers, Petitioner *v.* Workmen's Compensation Appeal Board (Firestone Tire & Rubber Company), Respondents.

Firestone Tire & Rubber Company, Petitioner *v.* Workmen's Compensation Appeal Board (Marion Myers), Respondents.

Argued June 7, 1982, before Judges ROGERS, BLATT and CRAIG, sitting as a panel of three.

*Marc S. Jacobs, Galfand, Berger, Senesky, Lurie and March,* for petitioner, Marion Myers.

*David F. Bortner,* with him *Roger E. Legg, Legg and Kurland,* for respondent, Firestone Tire & Rubber Company.

OPINION BY JUDGE ROGERS, July 23, 1982:

Both the claimant and the employer in this workmen's compensation case have appealed from an order of the Workmen's Compensation Appeal Board reversing a referee's decision awarding compensation to the worker.

Marion Myers was employed as a janitor by Firestone Tire & Rubber Company when, on February 16, 1976 while pushing a hand truck loaded with an oil filled drum, she slipped and "pulled something" behind her left knee. She testified that she completed her work that day, but the next morning experienced swelling in her left leg and calf. At the hospital to which her employer directed her the condition of her left leg was diagnosed as thrombophlebitis. She was treated by a number of doctors for pain and swelling of her left leg and knee. She returned to work, however, on September 14, 1976. In June, 1977, still suffering pain she consulted a Dr. Jerome S. Weisberg, who at that time diagnosed her condition as inflam-

matory arthritis of both knees, left ankle, and feet. The claimant left her work with Firestone for the last time on September 1, 1977 because, she testified, of pain in her leg. The principal question in this case is that of whether the incident of February 16, 1976 was the cause of her disability after September 1, 1977.

The claimant filed a claim petition on August 24, 1977. The referee, after hearings, found that the claimant had suffered a ruptured Baker's cyst and that the accident at work "at least flared the claimant's inflammatory arthritis" and, in addition to appropriate expenses, awarded compensation for the periods from February 17, 1976 to September 13, 1976 and from September 1, 1977 into the future. The referee also found that the employer was entitled to a credit of $1417.08 for accident and sickness benefits paid to the claimant. The employer appealed, assigning as error the award of compensation for disability *during the period after September 1, 1977 only,* contending that there was no competent evidence of a casual connection between the claimant's disability after September 1, 1977 and her work-related injury. The employer also challenged the referee's calculation of credit due it for sickness and accident benefits paid to the claimant. Although the employer had not raised any question on appeal concerning the propriety of the referee's decision with respect to the award of compensation for the period before September 1, 1977, the Appeal Board reversed the decision in its entirety on the ground that the claimant's medical evidence was equivocal and therefore incompetent.

Where there is no obvious causal relationship between an injury and work activity, a workmen's compensation claimant must establish the causal connection with unequivocal medical testimony in order to

recover, *Kepler Homes v. Hand,* 27 Pa. Commonwealth Ct. 291, 366 A.2d 969 (1976). Section 422 of The Pennsylvania Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §834 requires that all of the referee's findings of fact be supported by competent evidence. The claimant's medical evidence consisted crucially of the testimony of Dr. Weisberg, who, it will be remembered, testified that when he first saw the claimant some sixteen months after the accident she suffered at work she suffered from inflammatory arthritis in both legs. His testimony was adduced to establish that this condition was the result of the accident. It was pertinently as follows:

Q Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, as to whether or not the injury that she described at work has any relationship in this disease process that you've described to us?

. . . .

A From the initial time that I saw Mrs. Myers, I have been skeptical of the initial diagnosis of phlebitis.

Now, it's impossible for a doctor retrospectively, who has never seen a patient, a year later, to say for sure what happened. But with the degree of inflammation that she had in her joints when I saw her, I think that the accident ruptured a Baker's cyst, and that she may not have had phlebitis and it may not have been recognized for what the true problem was initially. Because in patients with inflammatory arthritis that we see, rupture of the joint capsule posteriorly in the calf of the leg is not uncommon.

And I think that if I had to assess the problem, I think it was probably at least—that aspect of the problem was at least directly related to the accident. And I think that she probably had a ruptured Baker's cyst. And I don't know how anyone could be certain.

I also think that we have a lady with an undiagnosed, but clearly definite, inflammatory arthritis. And it's a very sticky question medically as to what the cause of inflammatory arthritis is.

We really do not know the cause of rheumatoid arthritis. And there are some people who believe that trauma to the synovial membrane may play a role. And I would not be able to exclude the possibility that the trauma at least flared this woman's inflammatory arthritis.

And I think that she had no reason other than medical care for comming [sic] here initially. And I did not see her as someone out for secondary gain at the time. And I think that I would be inclined to believe that there's a direct relationship to the trauma.

Q Is that your opinion as her treating physician?

A Yes.

Q Is there any relationship between phlebitis and the development of the kind of arthritis that you've described here?

A . . . .

So I think that it would be hard to answer the question with a surety one way or the other.

Q What about the same question with respect to the relationship between rupture of a Baker's cyst and this kind of problem that she presents now?

A Well, the one thing that I think you would probably say about this, and probably is not so much the Baker's cyst, is that there really was blood in the joint fluid as she described at the time that Doctor Gross aspirated it.

. . . .

So I think there probably is some definite role indirectly of the fact that she had phlebitis, and the subsequent therapy that was instituted on the presumption, and synovitis.

But as far as—I think the trauma may have caused the Baker's cyst. A lot of this is supposition. I just—I find it very hard to believe that she did not have the inflammatory arthritis before I saw her in June. I think she had it for a year, historically.

A Are you saying then that you think it predated her accident or injury at work or—

A I honestly don't know. I think that, you know, as I've seen the process of events, I think that, you know, I would question whether she had phlebitis. And I would strongly wonder in a woman with very hot and inflamed joints, whether she would have not had a ruptured Baker's cyst to start it off. She certainly was not terribly symptomatic by the history she gave me prior to the accident.

It's very hard to know about the onset of some of the inflammatory arthritis, because they're quite insidious in their development. She might have had an inflammatory arthritis which was developing which was not symptomatic prior to the accident.

Q If that were true, would there be anything about an injury like this or an accident that would trigger that, make it symptomatic?

A Yeah. I think that's probably true, especially if my supposition is correct that she may have ruptured a Baker's cyst. I think that would make her very symptomatic.

This testimony is not the unequivocal medical evidence required to establish that the claimant's disability by reason of inflammatory arthritis after September 1, 1977, the only period still in question, was the result of her accident. Less than positive medical testimony, based upon supposition and possibilities, is not legally competent evidence of causation. *Halaski v. Workmen's Compensation Appeal Board,* 38 Pa. Commonwealth Ct. 607, 394 A.2d 680 (1978).

The claimant contends that the testimony of the employer's medical expert, Dr. Ronald E. Krauser, provided unequivocal evidence of a causal connection between the accident and her resulting disability. However, Dr. Krauser testified as follows:

Q You apaprently read Dr. Weisberg's deposition testimony?

A Yes, I did.

Q Okay. Is it your opinion that this woman could not have had a rupture of a Baker cyst?

A It is my opinion that that is probably exactly what happened.

Q And that in no way could have precipitated, contributed to or aggravated her subsequent problems in your opinion?

. . . .

A I think that it's very difficult in retrospect to establish whether this lady did have acute thrombophlebitis or rupture of a Baker cyst.

Q Excuse me. I asked you if you thought it was likely that she had a ruptured Baker cyst; and you said, "yes."

A Yes.

Q Now, my next question was: Did that rupture as a Baker cyst in any way contribute to, precipitate or aggravate her subsequent condition?

A In my opinion, no.

. . . .

Q Would you agree that in this incident with the immediate complaints of pain, and so on, that the incident with the 55-gallon oil drum where it fell backwards and she had to brace herself and felt this immediate sensation behind the left knee, that that's the most likely cause of the rupture of the Baker cyst?

A In terms of the timing, I must assume that.

Q Then you disagree with Dr. Weisburg that this had anything to do with her subsequent complaint?

A In my opinion, I would have to disagree.

Q The fact that she was asymtomatic before this incident with the oil drum, is that significant to you?

A Asymptomatic in terms of her knee or in terms of her other joints?

Q Both; everything.

A Well, I think for a cyst to rupture, it has to be present. I do not think the cyst occurred after the trauma.

Q Yes.

A Okay? I think that the association between rheumatoid arthritis and any traumatic state is coincidental; therefore, I would have

to say that even though her joint complaints were subsequent to the injury, that the association is not a real one and that the joint complaints would have occurred regardless of whether the injury took place or not.

Q Okay. Is it your understanding of the field of rheumatology that this particular area, the kind of phenomenom that we're disussing that there are clearcut answers in that all rheumatologists would agree with you?

A Of course not. Rheumatology is an imprecise field.

We do not believe that this testimony supports the claimant's theory; on the contrary, Dr. Krauser unequivocally stated that there is no causal connection between the claimant's work-related injury and her disability.

The claimant also contends that unequivocal medical testimony was not necessary because there is an obvious connection between her work-related injury and her later disability. *See Morgan v. Giant Markets, Inc.*, 483 Pa. 421, 397 A.2d 415 (1979); *Greene County Memorial Hospital v. Workmen's Compensation Appeal Board*, 61 Pa. Commonwealth Ct. 82, 432 A.2d 1166 (1981). We disagree. That the injury to the claimant's left leg resulted in her disability from inflammatory arthritis, afflicting both knees, feet, and her left ankle a year and a half later, does not strike us as obvious. We therefore affirm the Appeal Board's order insofar as it denies benefits for the claimant's period of disability beginning September 1, 1977.

Firestone contends that it was not given credit for sickness and accident benefits paid to the claimant after the last referee's hearing but prior to his decision. The claimant replies that this could be cured

by stipulation. We remand the record solely for the adjustment of this claim by the Appeal Board or the parties.

The order of the Appeal Board insofar as it denies compensation for disability or other claims for the period preceding September 1, 1977 is reversed; the Appeal Board's order is otherwise affirmed; the record is remanded for disposition by the Appeal Board or the parties of the employer's claim for credit for sickness and accident payments made after the last referee's hearing.

## ORDER

AND Now, this 23rd day of July, 1982, the order of the Workmen's Compensation Appeal Board No. A-79861 is affirmed in part and reversed in part. Judgment is entered in favor of the claimant Marion E. Myers and against Firestone Tire & Rubber Company and/or its insurance carrier as follows:

Compensation at the rate of $187.00 per week from February 16, 1976 to and including September 16, 1976. All deferred payments of compensation shall bear interest at a rate of 10% in accordance with the Act;

Reimbursement to claimant's attorney of $138.97 for costs.

Firestone Tire & Rubber Company is further directed to pay 20% of all compensation and interest awarded to the claimant, out of the claimant's award, directly to the claimant's attorney, and shall pay the balance thereof directly to the claimant.

The case is remanded to the Workmen's Compensation Appeal Board for a determination of the proper credit due Firestone Tire & Rubber Company on account of sickness and accident benefits paid the claimant.